*Patrick Joseph Thomas A/K/A Patrick Joseph Patrick v. State of Maryland*, No. 1115, September Term 2016.

Filed:  April 4, 2018

**HEADNOTES**

**Criminal Law – Homicide – Manslaughter – Evidence**

To support a conviction for manslaughter, the evidence must show a causal connection between the defendant's actions and the victim's death.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1115

September Term, 2016

_____

PATRICK JOSEPH THOMAS A/K/A/
PATRICK JOSEPH PATRICK

v.

STATE OF MARYLAND

_____

Leahy,
Friedman,
Rodowsky, Lawrence F.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Friedman, J.
_____

Filed:  April 4, 2018

Among the various and sometimes contradictory legal responses to the current opioid epidemic has been the decision by some state's attorneys to charge the sellers of heroin with homicide crimes when a buyer dies from overdose.[1] This case follows one of those prosecutions. We do not prejudge future cases nor make any broad pronouncement about the trend. Rather, we hold here only that in prosecutions for involuntary manslaughter, the State must prove beyond a reasonable doubt the existence of a causal nexus between the defendant's act and the victim's death. Because it did not do so here, we will reverse the appellant's manslaughter conviction.[2]

**FACTS**

Appellant, Patrick Joseph Thomas, was charged in a three count criminal indictment with heroin distribution, manslaughter, and reckless endangerment. He pleaded not guilty and was tried upon an agreed statement of facts in the Circuit Court for Worcester County. In this Court, as below, Thomas challenges the legal sufficiency of the facts to support a manslaughter conviction.[3]

---

[1] Alison Knezevich, *Maryland Prosecutors Pursue Manslaughter, Murder in Overdose Cases*, BALTIMORE SUN (December 7, 2017), https://perma.cc/UJY8-QZZN; Arelis R. Hernandez, *Selling Opioids in this Rural Maryland County Could Get You a Murder Charge*, WASHINGTON POST (August 9, 2017), https://perma.cc/4N8D-ZF4Y; Al Baker, *New Tactic in War on Opioids: Charging Dealers in Overdose Deaths*, NEW YORK TIMES (July 23, 2017), https://nyti.ms/2tRsvTv.

[2] Thomas has challenged neither his convictions for heroin distribution and reckless endangerment, nor the sentences that he received for those convictions. Therefore, we leave them undisturbed.

[3] Thomas brings two other claims: (1) that his sentences for heroin distribution and manslaughter must merge; and (2) that the docket entries must be corrected to reflect that

Mr. Thomas is a user and seller of heroin. When arrested at his home, Thomas was in possession of 60 white wax paper bags containing heroin. Each bag was stamped "Banshee" in blue with a blue emblem. Thomas volunteered to police that he used about 12 of these bags of heroin per day or about three shots a day of four bags each. Thomas admitted that out of the 60 bags he had recently obtained from his supplier, he would sell about 30, for $10-15 each, and keep the rest for personal use.

On the night and early morning hours of June 25-26, 2015, Thomas received 28 phone calls—only one call was answered—and several text messages from Colton Lee Maltrey, a user of heroin to whom he had previously sold. Maltrey sought to purchase $30 worth of heroin and Thomas sold him four bags.

Later that morning, Maltry was found dead of an apparent heroin overdose in the bathroom of his mother's house. With his body, police discovered four empty, white wax paper bags stamped "Banshee" in blue with a blue emblem. Police also found a prescription pill bottle with the label torn off that contained six 50-milligram tramadol pills,[4] which police theorized that Maltrey had stolen from his mother. The Office of the Chief Medical Examiner opined that:

> Colton Lee Maltrey died of alcohol and narcotic (free morphine) intoxication. The manner of death could not be determined. Autopsy detected increased levels of alcohol and a drug (free morphine) in the heart blood of the deceased. …

he was convicted of involuntary manslaughter. Because of our resolution of Thomas's first claim, however, we need not reach these.

[4] This Court takes judicial notice that tramadol, also sold as Ultram, is an opioid analgesic.

2

The deceased had been consuming alcoholic beverages and heroin (a drug) prior to death. Postmortem testing for additional drugs was negative.[5]

Thomas was convicted of heroin distribution, manslaughter, and reckless endangerment. He was sentenced to a twenty-year term for distribution and a concurrent 10-year term for manslaughter. As noted above, in this timely appeal, Thomas challenges the sufficiency of the evidence to sustain his manslaughter conviction.

**STANDARD OF REVIEW**

In a challenge to the sufficiency of the evidence, "the duty of the appellate court is only to determine 'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Chisum v. State*, 227 Md. App. 118, 130 n.1 (2016) (quoting *State v. Albright*, 336 Md. 475, 479 (1994)).

---

[5] While it is crystal clear that Maltrey ingested heroin, it is not clear to this Court whether the Medical Examiner's finding excludes the possibility that he had also ingested tramadol. The toxicology report found Maltrey's heart blood to contain 240 mcg/L of Free Morphine and reported that it was positive for 6-Monoacetylmorphine (6-MAM). The "presence [of 6-MAM] is unequivocal confirmation of heroin usage." Christopher J. Keary, et al., *Toxicologic Testing for Opiates: Understanding False-Positive and False-Negative Test Results*, PRIM. CARE COMPANION FOR CNS DISORD. (2012). Both tramadol and heroin metabolize into free morphine, however, and whether they can be distinguished depends on the type of test used. *Id*. Under our standard of review, in which we take the facts in a light most favorable to the State, we cannot, on this record, assume that Maltrey ingested the tramadol that was found with his body. If we could, however, it would be another factor outside of Thomas's control that was part of the cause of Maltrey's death.

**ANALYSIS**

There are, in Maryland, two principal variants[6] of involuntary manslaughter: *unlawful act manslaughter*; and *grossly negligent act manslaughter*. The trial court convicted Thomas under both variants.

## I.   UNLAWFUL ACT MANSLAUGHTER

Unlawful act manslaughter is, as Judge Moylan has described it, the "junior varsity manifestation of common law felony murder." CHARLES E. MOYLAN, JR., CRIMINAL HOMICIDE LAW 207 (2002) ("MOYLAN'S CRIMINAL HOMICIDE"). There are three

---

[6] In Chief Judge Robert C. Murphy's classic discussion of involuntary manslaughter, he described three categories:

> Involuntary manslaughter at common law has been generally defined as the killing of another unintentionally and without malice (1) in doing some unlawful act not amounting to a felony, or (2) in negligently doing some act lawful in itself, or (3) by the negligent omission to perform a legal duty. To this basic definition other authorities add the qualification, as to the first class of involuntary manslaughter, that the unlawful act be *malum in se*, and not merely *malum prohibitum*, and as to the second and third classes of the offense, that the negligence be criminally culpable, *i.e.*, that it be gross.

*State v. Gibson*, 4 Md. App. 236, 242 (1968) (internal citations omitted). Modern sources frequently combine the second and third categories into a single category regarding grossly negligent acts. *See, e.g.*, MARYLAND CRIMINAL PATTERN JURY INSTRUCTIONS, 4:17.9 *Homicide – Involuntary Manslaughter (Grossly Negligent Act and Unlawful Act)* (2017) ("MPJI-Cr"). Thomas also argues that there is space between these two categories and that he cannot be criminally liable for the grossly negligent conduct of an unlawful act. This makes no sense as a matter of logic but also as a matter of policy. Why should a really bad or sloppy miscreant avoid liability when a good one doesn't? Instead, we think this is another example of what Judge Moylan calls the "semantic fallacy of the false affirmative," MOYLAN'S CRIMINAL HOMICIDE 232, wherein which the phrase "lawful act," intended only to distinguish from "unlawful act" is attempted to be transformed into a new element of the crime.

elements: (1) that the defendant or another participating in the crime with the defendant committed or attempted to commit an eligible crime; (2) that the defendant or another participating in the crime killed the victim; and (3) that the act resulting in the death of the victim occurred during the commission, attempted commission, or the escape from the immediate scene of the eligible crime. *Bowers v. State*, 227 Md. App. 310, 314 n.4 (2016); MPJI-Cr 4:17.9 (B).

The list of eligible crimes is not yet completely drawn but we can see some of its parameters. The crimes must be *malum in se*, an act that is "naturally evil as adjudged by the sense of a civilized community" and "wrongful in itself 'without any regard to the fact of its being noticed or punished by the laws of the state.'" *Schlossman v. State*, 105 Md. App. 277, 285 (1995) (internal citations omitted).[7] By contrast, we know that crimes that are *malum prohibitum*, acts "that are only wrong because they are prohibited by statute," *id.*, cannot support an unlawful act manslaughter conviction. Judge Moylan tells us that the determination of whether an unlawful act is *malum in se* is "more concerned with the purely objective question of what the unlawful act itself is and does not change from case to case." MOYLAN'S CRIMINAL HOMICIDE 214-15. We know from *Johnson* and *Schlossman* that assault and battery crimes are *malum in se*. *Johnson v. State*, 223 Md. App. 128, 153 (2015); *Schlossman*, 105 Md. App. at 285.

---

[7] This Court recently reaffirmed *Schlossman* and held that unlawful act manslaughter need not be dangerous to life, but merely *malum in se*, to support a conviction for the unlawful act variant of involuntary manslaughter. *Johnson*, 223 Md. App. at 152.

We have not yet discovered a case that decides whether selling drugs is *malum in se* or *malum prohibitum*. On the one hand, one would have to live under a rock—and we do not—to miss the evils that the distribution of drugs causes for our State and Nation. On the other hand, the test isn't whether the unlawful act—here drug distribution—has bad or even deadly effects. Rather the question is whether drug distribution is prohibited by all civilized societies. We know that it is not. We know, for example, that other drugs, with similar effects and similar risks to those caused by heroin, are routinely prescribed by doctors and sold by pharmacists. *See* Md. Code, Criminal Law § 5-501 ("Dispensing of certain substances listed in Schedule II"); Corey S. Davis & Derek H. Carr, *The Law and Policy of Opioids for Pain Management, Addiction Treatment, and Overdose Reversal*, 14 IND. HEALTH L. REV. 1 (2017). We know that alcohol has different properties, but is, in all respects, another drug with its own deleterious and addictive consequences if abused, but which the State chooses to regulate but not prohibit. *See* Md. Code, Alcoholic Beverages §§ 1-201 *et seq*. Moreover, we know that the lines between lawful and unlawful conduct are changing: recent changes in drug laws have transformed marijuana sales from a serious crime to a growth industry, licensed by states and required to pay taxes. *See, e.g.*, COLO. CONST. ART. 18, § 16 ("Personal use and regulation of marijuana"). There are places in our world where drug use is treated as a public health problem rather than a criminal problem and, as a result, the distribution of even heroin in those places is highly regulated but not absolutely prohibited.[8] We need not reach this question in Thomas's case.

---

[8] Programs known as safe injection sites provide facilities for users to inject their own drugs under the supervision of trained staff. *See, e.g.*, German Lopez, *One Way Cities*

6

Instead, our decision here rests on the requirement of legal causation. The State must prove that the defendant's unlawful act was the legal cause of the victim's death. *Schlossman*, 105 Md. App. at 292 (analyzing legal causation); MPJI-Cr 4:17.9(B)(3) ("[T]he State must prove…that the act resulting in the death of [the victim] occurred during" the commission of the unlawful act); DAVID E. AARONSON, MARYLAND CRIMINAL JURY INSTRUCTIONS AND COMMENTARY 974 (2017 ed.) ("[T]o convict the defendant of manslaughter, a *causal connection* between the unlawful act … and the death must exist, although it is not essential that the ultimate harm that resulted was foreseen or intended.") (emphasis added). This is the same causal connection requirement that is demanded for convictions under felony murder—"but for" causation. *Stouffer v. State*, 118 Md. App. 590, 620 (1997) ("the felony must be a *sine qua non*, i.e., but for the felony, the deceased would not have been killed") (citing PERKINS & BOYCE, CRIMINAL LAW 67 (3d ed. 1982)); *Stewart v. State*, 65 Md. App. 372, 379 (1985) ("if a direct causal link between the accused's actions and the victim's death can be established, no more is required"); *Scott v. State*, 49 Md. App. 70, 82 (1981) (upholding felony murder conviction where "the line of

_____

*Can Reduce Overdose Deaths: Open Safe Spaces for Injecting Heroin*, VOX (January 24, 2018), https://perma.cc/W6B9-ZWLL (discussing safe injection sites in Europe, Canada, and Australia); Nicholas Kristof, *How to Win a War on Drugs*, NEW YORK TIMES (September 22, 2017), https://nyti.ms/2yhZWkX (discussing legalized drugs in Portugal). In other programs, heroin can be prescribed for users who have not had success with other forms of treatment. *See, e.g.*, German Lopez, *The Case for Prescription Heroin*, VOX (June 12, 2017) https://perma.cc/C2SX-UWWW (citing John Strang et al., *New Heroin-Assisted Treatment,* EUR. MONITORING CTR. FOR DRUGS AND DRUG ADDICTION (2012)) (discussing prescribed supervised injectable heroin treatment in Canada and Europe).

causation, running from the robbery to the murder, was quite clear and direct, and unbroken by any act fresh and independent of the common design") (internal quotation omitted).

Thomas sold Maltrey four bags of heroin. Later, at another time, in another place, Maltrey injected himself with an amount of heroin that he chose. He used it in conjunction with alcohol, which may have intensified the effect. In such a circumstance, we hold that the State failed to establish a causal connection between Thomas's sale of heroin and Maltrey's death. It is not impossible to imagine scenarios in which there will be a sufficient causal connection between the sale of heroin and the victim's death to satisfy this element of the unlawful act variant of involuntary manslaughter. There are cases in other jurisdictions, for example, where the defendant determined the dose and personally injected the victim. *See Powell v. Commonwealth*, 189 S.W.3d 535, 537 (Ky. 2006) (defendant convicted of reckless homicide for injecting some of his own heroin into the victim); *Commonwealth v. Vaughn*, 687 N.E.2d 270, 273 (Mass. App. Ct. 1997) (defendant convicted of involuntary manslaughter after injecting heroin into the victim); *cf. People v. Erb*, 894 N.Y.S.2d 266, 267 (N.Y. App. Div. 2010) (holding that the evidence was insufficient to establish criminal liability where the defendant "did not procure or inject the drugs that caused the death of the victim, nor did he place her in a location that made her less likely to obtain medical assistance"). Such facts might well satisfy the causal connection requirement. Similarly, there are situations in which the defendant adulterated the heroin (as with fentanyl) and the State can prove that the adulteration was the "but for"

8

cause of the defendant's death.[9] Here, however, where the causal chain was broken, there can be no liability for the unlawful act variant of involuntary manslaughter.

## II.   GROSSLY NEGLIGENT ACT MANSLAUGHTER

The grossly negligent act variant of involuntary manslaughter occurs when a defendant acts in a manner that is grossly negligent and causes the death of another. *State v. Pagotto*, 361 Md. 528, 548 (2000). As to this variant of involuntary manslaughter, we hold that the State failed to carry its burden of proof in two regards. *First*, the State may have established sufficient evidence from which a finder of fact could find that Thomas was negligent in the sale of heroin to Maltrey, but there was no evidence to establish that he was *grossly* negligent. *Second*, the grossly negligent variant of involuntary manslaughter requires that the defendant's act be the legal—"but for"—cause of the victim's death, and as discussed above, the required causal chain was broken.

Gross negligence is not just big negligence. For these purposes, gross negligence "must be sufficient beyond a reasonable doubt to establish that the defendant…had a wanton or reckless disregard for human life…. Only conduct that is of extraordinary or outrageous character will be sufficient to imply this state of mind." *State v. Kramer*, 318 Md. 576, 590 (1990). Judge Irma Raker reformulated the test in this way:

> In determining whether a defendant's actions constituted gross negligence, we must ask whether the accused's conduct, under the circumstances, amounted to a disregard of the

---

[9] Erika Butler, *Fentanyl Found in Majority of Heroin, Opioid-related Overdoses in 2017*, THE AEGIS (February 18, 2018), https://perma.cc/PE6H-WLWU; Josh Saul, *The New Drug: Deadly Fentanyl Being Sold Instead of Heroin by Greedy Dealers in the U.S.*, NEWSWEEK (October 26, 2017), https://perma.cc/5TXA-XAK3.

> consequences which might ensue and indifference to the rights of others, and so was a wanton and reckless disregard for human life. Stated otherwise, the accused must have committed acts so heedless and incautious as necessarily to be deemed unlawful and wanton, manifesting such a gross departure from what would be the conduct of an ordinarily careful and prudent person under the same circumstances so as to furnish evidence of an indifference to consequences. It is only conduct which rises to this degree of gross negligence upon which a conviction of involuntary manslaughter can be predicated.

*Albright*, 336 Md. at 500 (internal citations and quotation marks omitted). The case law is clear that "simple negligence or misadventure or carelessness" is not enough to sustain a manslaughter conviction. *Id.* at 499; *Duren v. State*, 203 Md. 584, 588 (1954); MOYLAN'S HOMICIDE LAW 233-34, 243-57.

We start from the premise, which the State appears to concede, that the sale of heroin, without more, is not gross negligence. There is no reason to infer the necessary state of mind from the ordinary transaction. Rather, we can infer the opposite—that a drug dealer wishes for his customers to remain alive so that he may sell them more heroin. Moreover, because low-level dealers are often themselves users and addicts, as Thomas is, they have no rational interest in making the conduct more dangerous. It is also worth noting that, if we were to consider every sale of heroin to be gross negligence, it reduces criminal liability down to a matter of mere fortuity. We do not apportion criminal liability for manslaughter merely because of bad luck.

The State's brief, however, identifies five facts, which together it says support the conclusion that Thomas acted in a grossly negligent manner toward Maltrey: (1) that the

10

amount of heroin contained in the four bags constituted a lethal dose;[10] (2) that Thomas knew Maltrey was an addict; (3) that Maltrey was young and less experienced than Thomas; (4) that Thomas was aware of the dangers of heroin use; and (5) that the circumstances of the sale—in the middle of the night, after Maltrey's multiple, frantic attempts to contact Thomas—were "weird." We hold as a matter of law that these facts, if believed, are evidence of simple negligence, not the sort of gross negligence necessary to sustain a conviction for involuntary manslaughter.

Moreover, as we described above, there must be a direct causal connection between the grossly negligent act and the victim's death. Here, the facts do not support the necessary causal link.

## CONCLUSION

We do not wish for this Opinion to be misunderstood. Thomas committed a serious crime and for it received a long sentence of incarceration. That was not challenged and we do not doubt its correctness. Nor do we say necessarily that drug dealers categorically cannot be liable for involuntary manslaughter when their customers die. We say only that the facts of this case do not legally support the conviction.

**JUDGMENT OF THE CIRCUIT COURT FOR WORCESTER COUNTY REVERSED AS TO MANSLAUGHTER ONLY. COSTS TO BE PAID BY WORCESTER COUNTY.**

---

[10] This point is hotly contested in the briefs but we need not resolve it.

11